## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## PADUCAH DIVISION
## CIVIL ACTION NO. 5:13-CV-00211-TBR

GLENN D. ODOM, II,                                                                                          Plaintiff,

v.

TABITHA THOMPSON, *et al.*,                                                                            Defendants.

### MEMORANDUM OPINION AND ORDER

Glenn D. Odom, II, a state inmate proceeding *pro se* and *in forma pauperis*, filed this action against Warden Randy White, Unit Administrator Hobert Huddleston, Officer Tabitha Thompson, and Officer Virgil Hughes, bringing an Eighth Amendment failure-to-protect claim vis-à-vis 42 U.S.C. § 1983, along with common-law claims for intentional and negligent infliction of emotional distress. With discovery now closed, the prison officials move for summary judgment. Ultimately, though most of Odom's claims come up short, a reasonable jury could find that Unit Administrator Huddleston violated Odom's rights under the Eighth Amendment. Accordingly, the prison officials' Motion for Summary Judgment, [R. 78], is **GRANTED IN PART** and **DENIED IN PART**.

### I.

### A.

During the period of time relevant to this action, Glenn D. Odom, II was incarcerated at the Kentucky State Penitentiary in Eddyville, Kentucky. Prior to April 24, 2013, Odom was housed in cellhouse three, which is a full-contact segregation unit. [*See* R. 82-2 at 2, ¶ 4 (Odom's Declaration); R. 82-10 at 31, ¶ 1 (Odom's Affidavit).] Following a series of threats from fellow inmates, Odom asked Warden Randy White, among other prison officials, to transfer him to cellhouse seven, which is a no-contact

1

segregation unit. [*See* R. 82-2 at 2, ¶ 4; R. 82-5 at 1 (Letter to Warden White).] Odom's request was denied at first, [*see* R. 82-2 at 2, ¶ 4; R. 82-5 at 2 (Grievance No. 13-04-086-G)], and so Odom staged a suicide attempt on April 24 in an effort to secure a transfer, [*see* R. 82-2 at 2, ¶ 4; R. 82-5 at 12–13 (Disciplinary Report No. KSP-2013-00826)]. The ploy worked, and Odom was reassigned to cellhouse seven, C-walk that same day. [*See* R. 82-10 at 31, ¶ 1.]

As previewed above, cellhouse seven differs from cellhouse three in that the former, unlike the latter, is a no-contact segregation unit. Out of concern for the safety of officers and inmates alike, Kentucky State Penitentiary policies and procedures prohibit opening one inmate's cell door while another inmate's cell door is open. [*See* R. 82-10 at 30 (KSP Memorandum).] To open or close a cell door, the cellhouse control officer must activate the switch corresponding to that particular cell from a control room overlooking the many walkways. [*See* R. 22-3 at 3 (Extraordinary Occurrence Report No. 167-13); R. 82-10 at 23, ¶ 19 (Huddleston's Response to Request for Admissions); *see also* R. 82-7 at 27 (Diagram).] There are reflective orange markers on the door's leading edge to help officers see the door's position, along with green and red lights to the side of each switch to indicate whether a cell door is open or closed. [R. 82-7 at 28, ¶¶ 1–2 (Odom's Affidavit); R. 82-10 at 23, ¶ 19; *see also* R. 82-7 at 27. *But see* R. 82-10 at 15–16 (Thompson's Response to Interrogatories) (acknowledging presence of lights, but denying proximity of those lights to the switches).]

Despite those precautionary measures, Odom reported a number of instances where the cellhouse control officer simultaneously opened multiple cell doors in 2013. [*See* R. 82-10 at 28, ¶ 3 (Huddleston's Affidavit) (admitting that a "few incidents"

occurred "in which more than one inmate's cell was open at the same time").] On July 31, for example, Odom complained to Unit Administrator Hobert Huddleston about three separate occasions where officers had opened his cell door and those of his neighbors at the same time. [R. 1 at 10–11, ¶ 25 (Verified Complaint); R. 82-6 at 34, ¶ 1 (Inmates' Affidavit).] Unit Administrator Huddleston told Odom that the situation would be "addressed." [R. 1 at 11, ¶ 25; R. 82-6 at 34, ¶ 2; *see also* R. 82-10 at 22, ¶ 11 (admitting conversation took place).] The following day, however, the same thing happened again, and so Odom wrote Warden White to complain. [R. 82-6 at 35 (Letter to Warden White); *see also* R. 1 at 11, ¶ 26.] It appears as if Warden White forwarded that letter to Unit Administrator Huddleston for response. [*See* R. 82-6 at 36 (Memorandum from Huddleston to Odom).] On August 5, Unit Administrator Huddleston confirmed, after reviewing surveillance footage, that "the sets of cell doors [Odom identified] were opened at the same time." [*Id.*] He assured Odom that "[t]his inappropriate action by the staff [would] be addressed." [*Id.*]

Odom had good reason to be concerned about this pattern of containment failures. Cellhouse seven houses particularly vulnerable inmates along with some of Kentucky's most dangerous inmates too. [R. 1 at 10, ¶ 24.] Standing at five-foot, three inches tall, and weighing just under one-hundred and thirty-nine pounds, Odom fits the former description. [*Id.* at 7, ¶ 14.] Michael Force, an inmate who is over six feet tall and weighs more than two-hundred and fifty pounds, fits the latter. [*Id.*, ¶ 13.]

Force was housed two cells away from Odom. While incarcerated at KSP, he displayed a particular aptitude for obtaining "dangerous contraband," such as razor blades

3

and shards of metal,[1] and, fittingly, has a long history of assaulting his fellow inmates too.[2] He is a "white supremacist," [*id.*; *see also* R. 82-8 at 10, ¶ 4 (Phelps' Affidavit)], and does not hide that fact either. He refers to other inmates, such as Odom (who is black), using racial slurs, [R. 1 at 9–10, ¶ 21], and has gone through the trouble of tattooing "white" and "power" on his left and right arms, respectively, [*id.* at 7, ¶ 13].

Unfortunately, it seems as though Odom's concerns about the pattern of inmate containment failures went unheeded until August 6, 2013. On that morning, Force was returning to his cell after showering. [R. 22-4 at 2 (Information Report).] Officer Tabitha Thompson opened Force's cell door from the control tower, watched him walk inside, and then activated the switch to close Force's cell door. [*Id.*] She turned to open a cell door on D-walk before turning back to open Odom's cell door. [*Id.*] After she activated Odom's cell door, Officer Thompson noticed that Force's cell-door indicator light showed "open." [*Id.*] While Odom claims that Officer Thompson maliciously left Force's cell door open, [*see* R. 1 at 12–13, ¶ 33; R. 82-2 at 3, ¶ 6], Officer Thompson says Force "trapped" his cell door, *i.e.*, obstructed it so as to prevent it from closing properly, [*see* R. 22-4 at 1, ¶ 3 (Thompson's Affidavit); *see also* R. 22-5 at 2, ¶ 4

---

[1] [*See, e.g.*, R. 82-9 at 8–10 (Disciplinary Report No. KSP-2012-01460) (finding Force guilty of fashioning three pieces of metal from drain cover); *id.* at 11–13 (Disciplinary Report No. KSP-2012-02255) (finding Force guilty of removing long strip of metal from door); *id.* at 37–38 (Unnumbered Disciplinary Report) (finding Force guilty of possessing two metal wires, a striker, and toothbrush without bristles); *id.* at 42–43 (Unnumbered Disciplinary Report) (finding Force guilty of possessing a razor blade); *id.* at 44–45 (Unnumbered Disciplinary Report) (finding Force guilty of possessing razor blade).]

[2] [*See, e.g.*, R. 82-8 at 9, 11 (Disciplinary Report No. KSP-2011-02411 (finding Force guilty of assaulting inmate on his way to shower); *id.* at 22–23 (Unnumbered Disciplinary Report) (finding Force guilty of assaulting inmate in the prison yard); R. 82-9 at 4–7 (Disciplinary Report No. KSP-2012-00278) (finding Force guilty of throwing feces on inmate); *see also id.* at 46–48 (Unnumbered Disciplinary Report) (finding Force guilty of attempting to assault officer).]

4

(Huddleston's Affidavit)].[3]  In any event, Force exited his cell and attacked Odom. [R. 1 at 13–14, ¶¶ 33–36.] He stabbed Odom nine times, [*id.* at 13, ¶ 34], with a metal "shank," [R. 82-2 at 3, ¶ 5]. Odom sustained six puncture wounds requiring seven stitches to close. [R. 1 at 17, ¶ 49.] The altercation ended once Officer Virgil Hughes, accompanied by other guards, intervened.

**B.**

Proceeding *pro se* and *in forma pauperis*, Odom filed this action against Warden White, Unit Administrator Huddleston, Officer Thompson, and Officer Hughes, bringing a failure-to-protect claim under the Eighth Amendment, along with common-law claims for intentional and negligent infliction of emotional distress. [*See* R. 1 at 1–3.] With discovery now closed, the prison officials move for summary judgment. [*See* R. 78 (Motion for Summary Judgment).] Odom opposes that motion.[4] [*See* R. 82-4 (Response).]

---

[3] On at least one prior occasion, Michael Force "trapped" his cell door, preventing it from closing. [*See* R. 82-9 at 17–18 (Unnumbered Disciplinary Report).]

[4] Before discussing the merits of the prison officials' motion for summary judgment, the Court must first address one procedural issue. In the main, Glenn D. Odom, II filed a motion to strike a portion of Warden Randy White's affidavit. [*See* R. 86 (Motion to Strike).] The relevant portion of the affidavit surmises: "[T]he evidence showed inmate Force injured inmate Odom with a 'flex pen' . . . ." [R. 22-2 at 1, ¶ 3 (White's Affidavit).] Odom argues, persuasively, that the recited portion of the affidavit is objectionable since it does not appear to be based on Warden White's personal knowledge. [*See* R. 86 at 1–2, ¶ 3.]
   Federal Rule of Civil Procedure 56(c)(4) requires, in pertinent part, that an affidavit offered in support of a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 495 (6th Cir. 2002). In order for "inferences, thoughts, and opinions to be properly included" in an affidavit, they must be premised "on firsthand observations or personal experience, and established by specific facts." *Giles v. Univ. of Toledo*, 241 F.R.D. 466, 469 (N.D. Ohio 2007) (citing *Harrah's Entm't, Inc. v. Ace Am. Ins. Co.*, 100 F. App'x 387, 394 (6th Cir. 2004); *Drake v. Minn. Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998); *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1355 n.2 (6th Cir. 1996)). Here, Warden White's affidavit has fallen short of that standard. Accordingly, Odom's motion to strike is granted: The Court will disregard that portion of the affidavit. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 593 (6th Cir. 2009) ("In resolving a motion to strike, the Court should use 'a scalpel, not a butcher knife,' . . . strik[ing] portions of affidavits that do not satisfy the requirements of [Rule 56(c)(4)]." (first alteration in original) (quoting *Giles*, 241 F.R.D. at 469)).

## II.

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

As the party moving for summary judgment, the prison officials must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Odom's claims. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming the prison officials satisfy their burden of production, Odom "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial."[5] *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

---

[5] A verified complaint, such as Odom's complaint in this action, "carries the same weight as would an affidavit for the purposes of summary judgment." *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (citing *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992)).

### III.

The prison officials move for summary judgment on Odom's § 1983 claim, along with his common-law claims for intentional and negligent infliction of emotional distress. [*See* R. 78.] Each of those claims, the prison officials say, fails on its merits. [*See* R. 22-1 at 8–11, 13–18 (Memorandum in Support).] In the alternative, the officials claim protection under the aegis of qualified immunity. [*See id.* at 11–13.] The Court will address each claim (and the prison officials' defense) in turn. Ultimately, though most of Odom's claims come up short, a reasonable jury could find that Unit Administrator Huddleston violated his rights under the Eighth Amendment.

### A.

To begin, Odom sues Warden White, Unit Administrator Huddleston, Officer Thompson, and Officer Hughes under 42 U.S.C. § 1983 for violating his Eighth Amendment rights. [*See* R. 1 at 3.] Section 1983 creates a private right of action "against officials who, under the color of state law, deprive individuals of their constitutional rights." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016) (citing 42 U.S.C. § 1983). There is no genuine dispute that the prison officials were acting under the color of state law at the time of Odom's assault. Instead, the officials maintain that none of them deprived Odom of his rights under the Eighth Amendment. [*See* R. 22-1 at 8–11.] Viewing the record in the light most favorable to Odom, the Court disagrees—though not entirely.

### 1.

"The Eighth Amendment prohibits the imposition of 'cruel and unusual punishments' upon prisoners." *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014)

7

(quoting U.S. Const. amend. VIII). To establish liability under the Eighth Amendment for a claim based on a failure to protect, the type of claim Odom presses in this action, Odom must show that the prison officials "acted with 'deliberate indifference' to a substantial risk" of serious harm befalling him. *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001). The concept of "deliberate indifference" encompasses both an objective and a subjective component.

To satisfy the objective component, an "inmate must show that 'he is incarcerated under conditions posing a substantial risk of serious harm.'" *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). The objective component must be analyzed in "the abstract." *Clark-Murphy v. Foreback*, 439 F.3d 280, 286–87 (6th Cir. 2006). The subjective component requires an inmate to "show that (1) 'the official being sued subjectively perceived facts from which to infer a substantial risk to the prisoner,' (2) the official 'did in fact draw the inference,' and (3) the official 'then disregarded that risk.'" *Richko v. Wayne Cty.*, 819 F.3d 907, 916 (6th Cir. 2016) (quoting *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014)), *petition for cert. filed*, No. 16-538 (U.S. Oct. 17, 2016). An official's state of mind must be "more blameworthy than negligence" before liability will attach. *Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997) (quoting *Farmer*, 511 U.S. at 835).

### 2.

Odom has cleared the first hurdle. That is, he has adduced sufficient evidence to show "that '[he] [was] incarcerated under conditions posing a substantial risk of serious harm.'" *Bishop*, 636 F.3d at 766 (quoting *Farmer*, 511 U.S. at 833). Cellhouse seven is a no-contact segregation unit, not only housing vulnerable inmates, but also inmates

known to be dangerous to prison staff and other inmates. [R. 1 at 10, ¶ 24.] The risk of exposing particularly vulnerable inmates, such as Odom, to especially dangerous inmates, such as Force, is substantial and obvious. *Cf. Byron v. Dart*, 825 F. Supp. 2d 958, 963 (N.D. Ill. 2011) (finding substantial and obvious risk to inmates whose cell doors would not secure properly). KSP's policies, which prohibit simultaneously opening multiple cell doors due to the threat of inmate violence, emphasize the seriousness of that risk. *See Newman v. Holmes*, 122 F.3d 650, 652 (8th Cir. 1997) ("[W]hen prison administrators conclude that all inmates . . . should be isolated as dangerous, it would encroach upon the administrators' greater knowledge of prison conditions for us to hold *as a matter of law* that release of such inmates to the general prison population does not create a substantial risk that they will attack others."). Viewing the record in the light most favorable to him, a reasonable factfinder could conclude that exposing Odom to other inmates in a no-contact segregation unit presented a substantial risk of causing him serious harm.

### 3.

The principal issue, then, comes down to whether the prison officials knew about and disregarded that risk. The subjective component, with limited exception, *see Phillips v. Roane Cty.*, 534 F.3d 531, 542 (6th Cir. 2008), must be "addressed for each officer individually," *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005). Accordingly, the Court turns to that task.

a.

Even giving Odom the benefit of the doubt, the record does not indicate that Warden White acted with deliberate indifference.[6] To be sure, Odom wrote a letter to Warden White explaining how officers had been opening his cell door and those of his neighbors at the same time. [R. 82-6 at 35; *see also* R. 1 at 11, ¶ 26.] A reasonable factfinder could conclude that Warden White was aware of the breakdown in containment procedures. In addition, the cellhouse in question is a no-contact segregation unit that confines both particularly susceptible and especially dangerous inmates. [R. 1 at 10, ¶ 24.] A jury could, therefore, infer that Warden White knew about the risk of inmate-on-inmate violence should officers ignore proper containment protocol.

However, Warden White did not ignore that risk. Instead, he forwarded Odom's letter to Unit Administrator Huddleston for response. [*See* R. 82-6 at 36.] The Eighth Amendment demanded nothing more from him. *See Bishop*, 636 F.3d at 770–71 (holding that an official may fulfill his "protective duties under the Eighth Amendment" by "referring the matter for further investigation or taking other appropriate administrative action"). There is insufficient proof, in sum, to establish that Warden White

---

[6] Odom alleges that Warden White violated his Eighth Amendment rights in another manner too. [*See* R. 82-4 at 21 (Response).] Briefly, around one year before the assault in question, Odom warned Warden White about the presence of razorblades in cellhouse seven. [*See* R. 82-6 at 1, ¶ 2 (Odom's Affidavit).] Odom faults Warden White for not conducting daily searches of inmates' cells in light of that admonition. [R. 82-10 at 31, ¶ 1 (Odom's Affidavit). *Contra* R. 22-2 at 1, ¶ 2 (averring daily searches were conducted).]

It seems clear that being confined among inmates armed with dangerous contraband, such as razorblades, poses a substantial risk of serious harm. There is insufficient proof, however, to suggest that Warden White acted with deliberate indifference to that risk. A prison official "who actually knew of a substantial risk of harm to inmate health or safety" does not violate the Eighth Amendment so long as the official "responded reasonably to the risk." *Bishop v. Hackel*, 636 F.3d 757, 769 (6th Cir. 2011) (quoting *Farmer v. Brennan*, 511 U.S. 825, 830 (1994)). While there may be some dispute about how often inmates' cells were searched, there is no dispute that those cells were searched, and with some regularity too. In these circumstances, the Eighth Amendment requires nothing more. Viewing the record in the light most favorable to Odom, he has not raised a triable issue as to whether Warden White exhibited deliberate indifference to his safety needs. Summary judgment is, therefore, warranted on this theory of liability too.

unreasonably disregarded any risk to Odom's safety by failing to take additional affirmative action to protect him.

b.

Although an exceedingly close call, the same cannot be said for Unit Administrator Huddleston.[7] In the week before the assault, Odom had a conversation with Unit Administrator Huddleston about how, on three prior occasions, officers had opened his cell door and those of his neighbors at the same time. [*See* R. 1 at 10–11, ¶ 25; R. 82-6 at 34, ¶ 1; *see also* R. 82-10 at 22, ¶ 11.] Unit Administrator Huddleston also handled Odom's correspondence to Warden White and confirmed that the allegations Odom made were, in fact, true. [*See* R. 82-6 at 36.] A reasonable factfinder could find, then, that Unit Administrator Huddleston knew about the containment problem and, for the reasons discussed earlier, of the obvious risk that the situation presented.

It is unclear, however, what steps, if any, Unit Administrator Huddleston took to protect Odom from harm. In response to both warnings, Unit Administrator Huddleston simply told Odom that the situation would be "addressed." [*See* R. 1 at 11, ¶ 25; R. 82-6 at 34, ¶ 2; *id.* at 36.] Unfortunately, Odom was assaulted shortly thereafter. Confronted

---

[7] Odom alleges a second way in which Unit Administrator Huddleston supposedly violated his Eighth Amendment rights too, [*see* R. 82-4 at 20], but that claim is meritless. In way of background, Unit Administrator Huddleston was one of four or five people who reviewed inmate mail in cellhouse seven in 2013. [R. 22-5 at 1, ¶ 2 (Huddleston's Affidavit).] One week after assaulting Odom, Force sent a letter to Paul Johnson, a fellow inmate, through the prison mail system. [*See* R. 82-7 at 39, ¶ 2 (Odom's Affidavit); *see also id.* at 40–41 (Letter from Force to Johnson).] In that letter, Force discussed, in less than friendly terms, his encounter with Odom the week prior. [*See id.* at 40–41.] Johnson shared that letter with Odom sometime later. [*Id.* at 39, ¶ 3.]

The way Odom sees things, Unit Administrator Huddleston violated his Eighth Amendment rights because, ostensibly, he allowed Force's letter to reach Johnson. [*See* R. 82-4 at 20.] However, Unit Administrator Huddleston denies reviewing Force's letter, [R. 22-5 at 1, ¶ 2], and Odom has come forward with no evidence to raise a genuine dispute of material fact on that point. Nonetheless, even if Odom were able to show Unit Administrator Huddleston allowed Force's letter to reach Johnson, there is nothing about the letter that objectively created a substantial risk of serious harm to Odom. *Cf. Hinton v. Doney*, 16 F.3d 1219, 1994 WL 20225, at *2 (6th Cir. 1994) (unpublished table decision) (holding guard's taunts to be insufficient to state an Eighth Amendment claim). Therefore, Unit Administrator Huddleston is entitled to summary judgment on this aspect of Odom's claim.

with evidence of that sort, a reasonable factfinder could determine that Unit Administrator Huddleston unreasonably disregarded a known risk to Odom's safety. *See Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 354–55 (6th Cir. 2001) (denying qualified immunity to warden who, although aware of threat to inmate, took no affirmative action to protect his health and safety).

**c.**

The record does not support a similar conclusion with respect to Officer Thompson though. KSP's policies, true enough, prohibit simultaneously opening multiple cell doors due to the threat of inmate violence. [*See* R. 82-10 at 30.] Officer Thompson was trained in the proper procedure for opening inmates' cell doors, [*see* R. 82-10 at 12, ¶ 14 (Thompson's Response to Request for Admissions)], and experienced in carrying out that task, [*see id.*, ¶ 13]. On that basis, a reasonable factfinder could determine that Officer Thompson was aware of the risk of inmate-on-inmate violence should she open multiple cell doors at once.

Nonetheless, Officer Thompson actions amount to, at worst, negligence, which is insufficiently culpable to make out an Eighth Amendment claim. *See Woods*, 110 F.3d at 1222. There is no evidence that Officer Thompson played a part in the prior containment failures. The single, isolated failure on Officer Thompson's part, although regrettable, does not reflect a reckless disregard for Odom's safety. *Cf. Baze v. Rees*, 553 U.S. 35, 50 (2008) ("[A]n isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty . . . .").

**d.**

Likewise, a reasonable finder of fact could not conclude that Officer Hughes acted with deliberate indifference towards Odom either. The record is not clear as to Officer Hughes' job duties or experience at KSP. From his discovery responses, however, he does not appear to be a stranger to cellhouse seven. [*See* R. 82-10 at 45, ¶¶ 21–22 (Hughes' Response to Request for Admissions); *id.* at 27 (Hughes' Amended Response to Request for Admissions).] Drawing all reasonable inferences in Odom's favor, it is possible that Officer Hughes was aware of the danger created by simultaneously opening multiple cell doors. There is a dearth of evidence, however, that Officer Hughes unreasonably disregarded any risk to Odom's safety. The only part that Officer Hughes played in the incident was intervening to protect Odom from Force. [*See* R. 22-3 at 3–4.] Odom alleges nothing that might show Officer Hughes acted, or failed to act, with deliberate indifference. [*See* R. 82-4 at 22.] Even viewing the record in the light most favorable to him, there is no reason to conclude that Officer Hughes unreasonably disregarded any risk of harm to Odom's safety. *See Patmon v. Parker*, 3 F. App'x 337, 338–39 (6th Cir. 2001) (affirming grant of summary judgment to officer in similar circumstances).

**4.**

In summary, and viewing the record in the light most favorable to Odom, a reasonable factfinder could conclude that exposing him to other inmates in a no-contact segregation unit objectively presented a substantial risk of serious harm. While a very close call, a reasonable jury could also find that Unit Administrator Huddleston was deliberately indifferent to that danger. Therefore, summary judgment is inappropriate as

13

to him. No reasonable factfinder could conclude, however, that Warden White, Officer Thompson, or Officer Hughes acted with deliberate indifference toward Odom. Accordingly, summary judgment in their favor is warranted.

### B.

Odom's remaining two state-law claims do not fare as well. The first of those is his claim for intentional infliction of emotional distress, also known as outrage, against Warden White, Officer Thompson, and Officer Hughes. [*See* R. 1 at 3.] In order to establish a common-law claim for intentional infliction of emotional distress under Kentucky law,

> [1] the wrongdoer's conduct must be intentional or reckless; [2] the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; [3] there must be a causal connection between the wrongdoer's conduct and the emotional distress; and [4] the emotional distress must be severe.

*Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 788 (Ky. 2004), *abrogated on other grounds by Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014), *as corrected* (Ky. Apr. 7, 2015), *and reh'g denied* (Ky. May 14, 2015); *see also Childers v. Geile*, 367 S.W.3d 576, 579 (Ky. 2012). The Court must decide, as to the second element, "whether the conduct complained of can reasonably be regarded to be so extreme and outrageous as to permit recovery" unless reasonable minds could differ on the subject. *Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 544 (Ky. Ct. App. 2013) (quoting *Goebel v. Arnett*, 259 S.W.3d 489, 493 (Ky. Ct. App. 2007)). The bar is set high, for, under Kentucky law, "a claim for the tort of outrage requires the plaintiff to prove conduct which is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hume v. Quickway Transp., Inc.*, No. 3:16-cv-00078-JHM,

14

2016 WL 3349334, at *9 (W.D. Ky. June 15, 2016) (quoting *Futrell v. Douglas Autotech Corp.*, No. 5:09-CV-21, 2010 WL 1417779, at *4 (W.D. Ky. Apr. 2, 2010)); *see also Mineer v. Williams*, 82 F. Supp. 2d 702, 706 (E.D. Ky. 2000) ("The standards for this tort are strict.").

Even when viewed in the light most favorable to him, Odom has identified no "outrageous and intolerable" conduct approaching that threshold. His claim is based, in principal part, on the actions discussed earlier in this opinion. Though some of that conduct is troubling, it cannot be "reasonably regarded as rising to the level of extreme and outrageous" conduct as Kentucky defines that concept. *Hume*, 2016 WL 3349334, at *9; *see also Stringer*, 151 S.W.3d at 789–91 (listing examples of actionable and nonactionable conduct); Restatement (Second) of Torts § 46 cmts. d to f (Am. Law Inst. 1977) (same).

But even if Odom could point to some "outrageous and intolerable" conduct on the part of Warden White, Officer Thompson, or Officer Hughes, he has failed to present any expert medical or scientific proof to support the claimed injury. Under Kentucky law, a person claiming intentional infliction of emotional distress must come forward with "expert medical or scientific proof" of a "'serious' or 'severe' emotional injury," such as mental stress that "a reasonable person, normally constituted, would not be expected to endure." *Osborne v. Keeney*, 399 S.W.3d 1, 17–18 (Ky. 2012); *accord MacGlashan v. ABS Lincs KY, Inc.*, 84 F. Supp. 3d 595, 605 (W.D. Ky. 2015). Expert proof is required, "even in cases involving an impact." *Sergent v. ICG Knott Cty., LLC*, No. 12-118-ART, 2013 WL 6451210, at *7 (E.D. Ky. Dec. 9, 2013) (citing *Osborne*, 399 S.W.3d at 16).

Beyond a psychiatric evaluation form, [*see* R. 82-8 at 6–7 (Psychiatric Medical Records)], Odom presented no evidence of that sort. His own statement of suffering severe emotional distress is insufficient to meet his burden under Kentucky law. *Keaton*, 436 S.W.3d at 544. Therefore, summary judgment on Odom's claim for intentional infliction of emotional distress is warranted.

### C.

In a similar vein, Odom brings a claim for negligent infliction of emotional distress against Unit Administrator Huddleston. [*See* R. 1 at 3.] To state a claim for negligent infliction of emotional distress under Kentucky law, Odom must come forward with (1) proof of duty, (2) breach, (3) causation, and (4) damages. *Osborne*, 399 S.W.3d at 17; *accord Reed v. Gulf Coast Enters.*, No. 3:15-CV-00295-JHM, 2016 WL 79998, at *15 (W.D. Ky. Jan. 6, 2016). Just as with a claim for intentional infliction of emotional distress, the claimed damages must be supported with "expert medical or scientific proof" of a "'serious' or 'severe' emotional injury." *Osborne*, 399 S.W.3d at 17; *accord MacGlashan*, 84 F. Supp. 3d at 605. Odom has failed to produce such evidence. Accordingly, summary judgment is appropriate on this final claim too.

### D.

Last but not least, the prison officials (though, arguably, just Officer Thompson) seek summary judgment as to Odom's § 1983 claim on qualified immunity grounds.[8] [*See* R. 22-1 at 11–13.] Generally speaking, the doctrine of qualified immunity shields

---

[8] The prison officials also argue, in a cursory fashion, that qualified immunity shields them from Odom's state-law claims too. [*See* R. 22-1 at 13 (Memorandum in Support).] Regarding Odom's state-law claims, Kentucky qualified-immunity law applies. *Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011) (citing *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)). Because the Court finds Odom's state-law claims fail on the merits, however, it need not—and will not—conduct a state-law qualified immunity analysis.

16

government officials from liability for civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *accord Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012). To overcome an official's claim to qualified immunity, the opposing party must show (1) that the official's conduct violated a constitutional right, (2) which was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Odom has satisfied both prongs as to Unit Administrator Huddleston. Taking the record in the light most favorable to him, a reasonable factfinder could conclude that Unit Administrator Huddleston was deliberately indifferent to a substantial risk of serious harm to Odom, and that he disregarded that risk by failing to take reasonable measures to protect him. *See Richko*, 819 F.3d at 915. The constitutional right to be free from inmate-on-inmate violence is clearly established too. *See Farmer*, 511 U.S. at 833; *Wilson v. Yaklich*, 148 F.3d 596, 600 (6th Cir. 1998). Therefore, summary judgment on the basis of qualified immunity is unavailing.

## IV.

**IT IS HEREBY ORDERED** that Glenn D. Odom, II's Motion to Strike, [R. 86], is **GRANTED**. The Court **SHALL** disregard the objected-to portion of the Affidavit of Warden Randy White, [R. 22-2].

**IT IS FURTHER ORDERED** that the Prison Officials' Motion for Summary Judgment, [R. 78], is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED.**

Date:

cc: Counsel of Record
Plaintiff, *pro se*

17